

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOSEPH ZIMNY,                           )
                               )
           Plaintiff,              )        No. 04 C 7878
                               )
      v.                                       )        Magistrate Judge Schenkier
                               )
JO ANNE B. BARNHART,                     )
COMMISSIONER OF                          )
SOCIAL SECURITY,                         )
                               )
           Respondent.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Joseph Zimny, seeks judicial review of a final decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 405(g). The parties have filed cross motions for summary judgment: the plaintiff seeks reversal or remand of the Commissioner's decision, and the Commissioner seeks a judgment affirming her decision. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all proceedings, including the entry of final judgment (doc. ## 8-10). For the reasons set forth below, the Court grants the Commissioner's motion for summary judgment (doc. # 19) and denies Mr. Zimny's motion for summary judgment (doc. # 16).

### I.

On April 30, 2001, Mr. Zimny filed an application for DIB, alleging a disability onset date of April 27, 2001, due to traumatic head injury, herniated disk, and back injury (R.100).[1] The Social Security Administration ("SSA") initially denied Mr. Zimny's claim by a notice dated August 24,

---

[1] Mr. Zimny previously filed an application for DIB, and in June 1999, he received benefits for a prior period, with an onset date of December 13, 1988 (R. 120). Due to Mr. Zimny's performance of substantial gainful activity, his benefits were terminated in October 1997.

2001, and upon reconsideration by a notice dated November 27, 2001 (R. 57, 65). After a timely request for a hearing, on November 6, 2002, Mr. Zimny appeared with counsel before an Administrative Law Judge ("ALJ"), who heard testimony from Mr. Zimny and a Vocational Expert ("VE") (R. 22-52). On December 16, 2002, the ALJ issued a written decision, denying Mr. Zimny's claim for DIB (R. 14-21). The SSA Appeals Council denied review of the ALJ's decision on October 22, 2004, thereby rendering the ALJ's decision the final decision of the Commissioner, subject to judicial review in this Court (R. 5).

## II.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will first discuss Mr. Zimny's personal and medical history. Next, the Court will summarize the hearing testimony and the ALJ's written decision.

## A.

Mr. Zimny was born on November 21, 1957 and was 44 years old at the time of the ALJ's decision (R. 27). He was thus a person of "younger age" under the Act (R. 19). He has a high school education and has completed courses in junior college and vocational school (R. 28). He has past relevant work experience as a shipping clerk and copier technician (R. 112). Mr. Zimny's last full time employment was as a shipping clerk, which ended when he was laid off on April 27, 2001 due to economic reasons (R. 29-30). Mr. Zimny has not engaged in full time work since that date; however, since October 2001, he has worked 20 hours per week as a grocery bagger at a supermarket (R. 30-31).

## B.

The medical record indicates that in December 1988, Mr. Zimny sustained injuries due to a motor vehicle accident (R. 150). In November 1993, Mr. Zimny underwent a neuropsychological evaluation with Dr. Gilliland, a licensed psychologist (R. 150-57). Dr. Gilliland found Mr. Zimny to be "alert, well oriented, pleasant and cooperative" (R. 151). He further noted that Mr. Zimny's "speech was fluent," that his fine-motor coordination "in tact," and that he was "attentive throughout all testing sessions" (*Id.*)

Dr. Gilliland administered a series of tests, including the Wechsler Adult Intelligence Scale-Revised (WAIS-R) (R. 152). The results of this test indicated a Verbal IQ of 99, Performance IQ of 98, and Full Scale IQ of 98 (R. 152). Dr. Gilliland concluded that Mr. Zimny's IQ placed him within the average range of mental functioning (R. 152). His verbal functioning was average while his numeric reasoning evidenced "mild difficulty" (R. 152). Dr. Gilliland noted cognitive slowing and that Mr. Zimny was mildly impaired in terms of maintaining complex attention (R. 153). The testing further revealed adequate memory abilities and mild to moderate limitations in executive functioning (R.156).

Dr. Gilliland's testing further indicated below average functioning with his dominant left hand and mild impairment with his right hand (R. 153). Mr. Zimny demonstrated a moderate to severe range of impairments in finger tapping speed for both hands and mildly limited grip strength for both hands (R. 153). Dr. Gilliland diagnosed Mr. Zimny with an organic mental disorder (R. 157). Dr. Gilliland further noted that while the testing suggested difficulties in managing anger, Mr. Zimny appeared to be "coping" relatively well with the multiple pressures that are confronting him" (R. 156).

In April 1998, Dr. Payne treated Mr. Zimny for complaints of low back pain and right-sided pain radiating into his right posterior buttocks and posterior thigh (R. 180). Mr. Zimny had been previously treated with anti-inflammatory medications and physical therapy (R. 180). Dr. Payne noted a large extruded disc herniation with extruded fragment and S1 radiculopathy (R. 180). Dr. Payne diagnosed Mr. Zimny with minimal degenerative arthritis of the low back, right wrist and thumb (R. 168).

Later that month, on Dr. Payne's recommendation, Mr. Zimny underwent a lumbar laminectomy and disectomy (R. 180). Three weeks after the laminectomy, Dr. Payne noted that Mr. Zimny was doing quite well (R. 216). Mr. Zimny had no complaints of pain and reported that he was walking about a mile and a half a day (R. 216). Six weeks after the surgery, Mr. Zimny exhibited negative straight leg raising and intact motor and sensory responses (R. 215). Dr. Payne noted once again that Mr. Zimny was "doing quite well," had no significant leg pain, placed him in physical therapy, and allowed him to return to work with restrictions on lifting, twisting, bending, and pushing/pulling (R. 215).

On July 23, 1998, Mr. Zimny reported increasing back pain and no real leg pain, which Dr. Payne diagnosed as low back pain with acute flare up (R. 214). Dr. Payne recommended that Mr. Zimny take a week off from therapy to allow the flare-up to calm down (R. 214). At Mr. Zimny's next two visits in November and October 1998, Dr. Payne noted that Mr. Zimny was doing well after surgery (R. 212-213).

On January 11, 2000, while Mr. Zimny was working at a manufacturing plant, he reported that he was experiencing back and leg pain (R. 211). Upon examination, Dr. Payne diagnosed Mr. Zimny with lower back pain and possible recurrent disc herniation (R. 211). He noted full (5/5)

4

muscle strength in all lower extremities, intact reflexes, and negative straight leg raise (R. 211). Dr. Payne prescribed physical therapy and imposed work restrictions that prohibited Mr. Zimny from lifting, bending, and twisting (R. 211). One week later, Mr. Zimny told Dr. Payne that icing his back had helped him, but he still reported some pain (R. 211). Dr. Payne noted that Mr. Zimny was "doing pretty well" and advised him to continue his therapy (R. 211).

In February 2000, Mr. Zimny completed an advanced physical therapy work hardening program but still reported some back pain, a muscular related leg pain on his right leg, and a pulling at the knee and foot (R. 210). Mr. Zimny further complained of a gap with pain in the knee and the bottom three toes (R. 210). Dr. Payne continued to restrict Mr. Zimny from work that involved twisting, lifting or bending, and ordered an MRI to evaluate his lumbar spine (R. 210).

Mr. Zimny underwent two MRI's in February 2000. The February 15, 2000 MRI showed disc space narrowing at L5-S1 accompanied by end-plate sclerosis and marginal spurring (R. 179). The MRI also showed Schmorl's nodes at T12-L1 and L1-L2 (R. 179). On February 28, 2000, an MRI performed of the lumbar spine indicated residual disc herniation at L5-S1 centrally with minimal posterior nerve root deviation and right laminectomy defect at L5, but it showed no indication of spinal stenosis or nerve root deviation at L4-5 (R. 178).

In April 2000, Dr. Payne noted that Mr. Zimny was able to return to work (R. 174). In June 2000, Mr. Zimny complained of occasional charley horses in his leg at night and pain in his right knee and the side of his great toe (R. 173). After examining Mr. Zimny, Dr. Payne noted that he could forward flex to 40 degrees with some pain, had no pain with extension, and no pain with rotation to the right or left or lateral bending (R. 173). Dr. Payne said that Mr. Zimny was limited to lifting 30-35 pounds (*Id.*). Dr. Payne indicated that while Mr. Zimny had low back pain, but was

"doing pretty well" (*Id.*). In February 2001, Dr. Payne noted that Mr. Zimny was doing well post lumbar disk surgery and showed full (5/5) motor strength and normal sensory testing (R. 209).

On April 30, 2001, an SSA interviewer spoke with Mr. Zimny. That interviewer observed that there does seem to be a slight misfire between thoughts and response (R. 122). However, the interviewer did note that Mr. Zimny had no difficulty in understanding, coherency, concentrating, or answering questions (R. 122).

On June 20, 2001, Dr. Karri, a State agency internist, performed a consultative examination of Mr. Zimny (R. 158-60). On examination, Dr. Karri noted that Mr. Zimny obtained relief from lower back pain by walking (R. 158). Dr. Karri further noted that because Mr. Zimny could not bend over he had difficulty wearing shoes; but, Dr. Karri also observed that Mr. Zimny was able to perform the usual activities of daily living, and could handle objects normally (R. 158). Upon examination, Dr. Karri noted that Mr. Zimny could walk 50 feet without support or a limp and got on and off the examination table without difficulty (R. 160). Dr. Karri also observed that the grip in both of Mr. Zimny's hands appeared normal, and that his "digital dexterity is not impaired" (R. 159); but, he also noted that Mr. Zimny had difficulty picking up a coin (R. 160). Dr. Karri wrote that Mr. Zimny could walk on heels and toes, and could oppose fingers (R. 160).

After examining Mr. Zimny and a lumbar spine x-ray, Dr. Karri diagnosed a history of low back pain, disc herniation at L5-S1 and L4-5, frequent urination, decreased range of motion of the lumbar spine, history of psoriasis, and a history of closed head injury resulting in understandable, but slurred speech and difficulty finding words (R. 160). Range of motion testing was normal in every joint, and straight leg raising was negative (R. 160). Lumbar flexion was 50 degrees; extension was 10 degrees, and lateral rotation was 10 degrees bilaterally (R. 160).

On June 27, 2001, Mr. Zimny underwent a psychiatric examination with Dr. Vora, a state agency psychiatrist (R. 163-64). Dr. Vora noted that Mr. Zimny was under the care of a psychiatrist and was not taking any psychiatric medication (R. 163). He further noted that Mr. Zimny was depressed on and off and had difficulty sleeping due to the pain in his back (R. 163). Dr. Vora also noted that Mr. Zimny maintained a normal range of daily activities (R. 163). These activities included cleaning, performing household chores, watching TV, and socializing with friends (R. 163). Dr. Vora observed that Mr. Zimny was alert, his speech was normally productive, and he demonstrated no looseness of association, flight of ideas, thought blocking, or tangentiality (R. 164). Dr. Vora further found Mr. Zimny to be "sociable" and "cooperative," and that he "gave relevant consensus to questions" (R. 164). Mr. Zimny could repeat 7 digits forward and 6 backward, subtract down to 72 performing serial sevens, add, subtract, and multiply (R. 164). Additionally, Mr. Zimny could name the last four United States presidents (R. 164). Dr. Vora diagnosed Mr. Zimny with atypical depression and organic brain disorder secondary to head trauma (R. 164), but further stated he would be able to manage his own funds (*Id.*).

On August 2, 2001, state agency psychiatrist, Dr. Travis, reviewed the medical evidence and considered it under Listings 12.02 and 12.04 (20 C.F.R. Pt. 404, Subpt. P, App. 1) (R. 191-204). Dr. Travis concluded that Mr. Zimny suffered from mild organic brain disorder and atypical depression (R. 192, 194). Dr. Travis also concluded that Mr. Zimny had no limitation in carrying out activities of daily living and in social functioning, and he had no episodes of decompensation (R. 201). He further concluded that Mr. Zimny has a non-severe organic brain disorder (R. 191), with only mild difficulties in maintaining concentration, persistence or pace (R. 201). Dr. Travis observed that Mr. Zimny's condition did not reflect the "B" or "C" criteria for either Listing 12.02 or 12.04 (R. 201-

7

(R. 201-202). Dr. Travis further noted that Mr. Zimny exhibits poor concentration under stress and functions well with no psychiatric concerns (R. 203).[2]

On August 15, 2001, Dr. Gatanco, a State agency internist, completed a Physical Residual Functional Capacity Assessment of Mr. Zimny that indicated that Mr. Zimny has low back pain with disc herniations and a history of closed head injury (R. 182-83). Based on his review of the medical records, Dr. Gatanco noted that despite his impairments, Mr. Zimny was capable of medium work activity that required the lifting of 25 pounds frequently, 50 pounds occasionally, sitting for six hours in an eight hour day, and standing and/or walking six hours in an eight-hour day (R. 182-83). Dr. Gatanco noted that Mr. Zimny's motor strength was intact and that his grip strength was normal (R. 184). He further observed that, while Mr. Zimny could perform dexterous movements, he did have some difficulty picking up a coin (R. 184). Dr. Gatanco concluded that Mr. Zimny would retain the capacity to perform medium work activity (R. 184).[3]

In mid-November 2001, Mr. Zimny began experiencing increased back tenderness with tremors in his right leg (R. 206). A physical examination on November 29, 2001, revealed mild tenderness of the back to palpation; however, the rest of the exam was within normal limits (R. 206). Dr. Payne prescribed physical therapy and Vioxx for Mr. Zimny's low back pain (R. 206). In December 2001, Dr. Payne conducted a follow-up examination of Mr. Zimny (R. 205). He noted full (5/5) muscular strength in the lower extremities and intact reflexes (R. 205). Mr. Zimny's back was nontender to palpation, and Mr. Zimny reported a decrease in pain since his visit to Dr. Payne

---

[2]Another state agency psychiatrist, Dr. David Bister, reviewed the filed and Dr. Travis's assessment, and on November 14, 2001, stated that he concurred with it (R. 191).

[3]Another state agency physician, Dr. Bruce Donnelly, reviewed the file and Dr. Gatanco's assessment, and on November 13, 2001 expressed his agreement with it (R. 182).

8

two weeks earlier (R. 205). During the examination, Mr. Zimny demonstrated negative straight leg raising sitting (R. 205). Dr. Payne concluded that Mr. Zimny's low back pain was resolving (R. 205).

## C.

On November 6, 2002, the ALJ held an Administrative Hearing (the "hearing") (R. 22-52). During this hearing, Mr. Zimny (R. 27-45) and a VE testified (R. 45-49).

## 1.

At the hearing, Mr. Zimny testified that he is currently employed as a bagger at Jewel and works about 20 hours per week (R. 26). The ALJ then asked Mr. Zimny several questions about his employment history. Mr. Zimny stated that from 1994 until 2001, he worked as a shipping clerk (R. 29). His work involved filling orders and lifting about 50 pounds on a fairly routine basis (R. 29). He testified that after he returned from his herniated disc operation, he was transferred from the shipping department to the brush department (R. 44). Mr. Zimny stated that in the brush department, he had to stand in one spot and push down and then tap a pedal with his foot on a consistent daily basis (R. 44). He underwent physical therapy and afterwards, he was put in the staples department where he sat on a stool and bent squeegees (R. 44). The most Mr. Zimny had to lift and carry in this job was 10 pounds (R. 44). He further stated that in April 2001, his employer laid him off because of a downturn in the economy (R. 30).

Mr. Zimny testified that after his lay-off, he contacted the Department of Rehabilitation Services who found him a part-time job at Jewel bagging groceries (R.30). Mr. Zimny stated that he began working at Jewel in October 2001 (R. 30). He also testified that, because his back could

9

not handle standing in one place bent over for a full day and the constant lifting of heavy groceries would strain his back, he would not be able to become a checker at Jewel full-time (R. 32, 36).

Mr. Zimny testified that he has low back pain that comes and goes (R. 33). Cold and damp weather, standing bent over, slouching while seated, and lifting anything over 30 pounds increases his low back pain (R. 33-34). Mr. Zimny further testified that he is able to manage his own money, use a calculator, and pay his own bills and that he uses a daily planner to keep track of bill due dates (R. 35-36, 41). He is able to perform all household chores like the laundry and grocery shopping (R. 35). Mr. Zimny further testified that while he had seen a psychologist, he is not seeing any doctors on a regular basis (R. 37). He also noted that he is not seeing a counselor and is not on any prescribed depression medication (R. 37-38). He indicated that he has some problems with long-term memory and immediate recall (R. 39).

**2.**

Ms. Hoiseth, a vocational rehabilitation counselor, testified as the VE at Mr. Zimny's hearing (R. 45). The VE began by addressing Mr. Zimny's past relevant work experience (R. 45-46). According to the VE, Mr. Zimny's prior work experience as a shipping and receiving clerk would be classified as medium, unskilled work (R. 46). The VE also noted that Mr. Zimny's past work as a copier technician would be classified as light, skilled work (R. 46).

The ALJ asked the VE to answer a hypothetical question based upon Mr. Zimny's age, education and vocational background (R. 46). In the hypothetical, the ALJ had the VE assume an individual of Mr. Zimny's age, education and vocational background who could perform unskilled work limited to lifting no more than 20 pounds occasionally and 10 pounds frequently; standing, walking or sitting for up to 6 hours in an 8-hour workday; and pushing or pulling no more than 20

pounds (R. 46-47). The VE testified that someone with the limitations that the ALJ had described could not perform Mr. Zimny's past relevant work (R. 47). The ALJ then asked whether any jobs would be available for an individual with those limitations (R. 47). In response, the VE testified that in the regional area of metropolitan Chicago, approximately 6,200 jobs were available for inventory clerks, 2,200 jobs for order clerks, 1,000 jobs for information clerks, 23,000 jobs for assemblers, and 9,000 jobs for production inspectors (R. 47).

Mr. Zimny's attorney then questioned the VE (R. 47-49). Mr. Zimny's attorney asked the VE to consider an individual of the same vocational background and weight restrictions but added additional restrictions (R. 47). These restrictions included: difficulties maintaining concentration persistence and pace; difficulty taking criticism or instruction from supervisors; a low frustration tolerance; restrictions on fine motor skills on a repetitive basis (but an ability to perform these skills on an occasional basis (one-third of the day)); and no frequent bending or stooping (R. 47-48). The VE noted, however, that Mr. Zimny had an ability to stand, walk, and sit for 6 to 8 hours a day (R. 47-48).

The VE testified that the restrictions on fine repetitious motor skills would rule out the assembler jobs (R. 49), but that whether the other jobs could be performed depended on the degree that the individual was afflicted with the other difficulties posited by Mr. Zimny's attorney (R. 48). The VE further noted that the degree to which the inability to take instruction or criticism from a supervisor affected an individual in a vocational context depended on how frequently these behaviors intruded in the workplace, the amount of time supervisors would have to spend dealing with the individual, and how these behaviors affected other people on the job (R. 49). The VE added that the

11

previous jobs she cited were unskilled and not at the supervisory level, but individuals in these jobs would have to relate to supervisors (R. 49).

**D.**

The ALJ issued his decision on December 16, 2002 (R. 14-21). The ALJ applied the standard 5-step sequential evaluation pursuant to 20 C.F.R. § 404.1520. At Step 1, the ALJ found that Mr. Zimny had not engaged in any substantial gainful activity since April 27, 2001, the alleged onset date of disability (R. 15, 20). At Step 2, the ALJ found that Mr. Zimny had a combination of impairments considered "severe" within the meaning of the Regulations (R. 16-17, 20).

The ALJ, however, found that Mr. Zimny did not meet the requirements of Step 3 (R. 17, 20). The ALJ determined that the combination of Mr. Zimny's impairments were not severe enough to meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (R. 17, 20). In reaching this conclusion, the ALJ pointed to Dr. Gilliland's 1993 Report that Mr. Zimny's counsel had submitted (R. 17). The ALJ concluded that "[w]here this report disagrees with more current assessments" he found the "more current assessments more probative" (R. 17). The ALJ rejected Mr. Zimny's argument that Dr. Gilliland's report supported a conclusion that he met the criteria for Listings 12.02 or in the alternative 12.04 (R. 17). The ALJ found that while the testing revealed that Mr. Zimny's IQ was within the average range of mental functioning, the testing confirmed "some cognitive slowing" (R. 17). The ALJ noted, however, that the testing also confirmed "adequate mental abilities" (R. 17). The ALJ also noted that Mr. Zimny compensated for his mild to moderate limitations in executive functioning by using a daily planner (R. 18). The ALJ further determined that Mr. Zimny's "activities of daily living and his ability to live totally independently and perform all tasks necessary to do so" contradict Mr. Zimny's conclusion that his

diminished ability in finger tapping and grip strength equaled a marked limitation in reaching and manipulation (R. 18). The ALJ concluded that the Report as a whole did not support Mr. Zimny's conclusions (R. 18).

After concluding that Mr. Zimny's impairments were not medically equivalent to any of the Listings, the ALJ moved to Step 4. At this step, the ALJ determined Mr. Zimny's residual functional capacity (RFC). The ALJ cited to Dr. Gatanco's August 15, 2001 report indicating Mr. Zimny could lift 25 pounds frequently and 50 pounds occasionally, and could stand or walk six hours in an eight-hour work day (R. 16), as well evidence that he suffered from "mild restrictions in concentration, persistence and pace, activities of daily living and social functioning with no episodes of decompensation of extended duration" (R. 18). The ALJ concluded that Mr. Zimny retained the RFC to perform unskilled, light work on a sustained basis (R. 17, 20). The ALJ also accepted the VE's testimony that Mr. Zimny's capacity to perform only light, unskilled work precludes the performance of any past relevant work (R. 18).

At Step 5, the ALJ acknowledged that the burden shifts to the SSA at this step "to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with his residual functional capacity, age, education and work experience" (R. 18) The ALJ concluded that a significant number of jobs exist in the national economy that Mr. Zimny could perform (R. 18, 20). The ALJ came to this conclusion by using Medical Vocational Rule 202.21 as a framework and by adopting the VE's testimony (R. 18, 20).

In so finding, the ALJ acknowledged that the "claimant's age, education, and vocationally relevant past work experience, if any, must be viewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations" (R. 18). The ALJ noted that the Medical-

Vocational Guidelines were a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any nonexertional limitations (R. 19). When considering this, the ALJ found that, based upon Mr. Zimny's residual functional capacity, he was "capable of performing a significant range of light work" (R. 19). The ALJ concluded that Mr. Zimny's "ability to perform all or substantially all of the requirements of light work [was] impeded by additional exertional and/or non-exertional limitations" (R. 19). Relying on the VE's testimony, the ALJ then concluded that "considering the claimant's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy" (R. 19). Accepting the VE's testimony, the ALJ concluded that examples of such jobs included work as an inventory clerk (6,200 jobs), order clerk (2,200 jobs), information clerk (1,000 jobs), product inspector (9,000 jobs), and some assembler jobs (23,000) (R. 20). Thus, the ALJ found that within the framework of Medical-Vocational Rule 202.21, a finding of "not disabled" was warranted (R. 19, 20).

## III.

To establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2004). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404. 1520 (2004). Under this test,

the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(c). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, review the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Schedule*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact which are supported by "substantial evidence," 42 U.S.C. §§ 405(g) (2004), defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

15

*Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 199); *see also Stacey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Erhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

Of course, the Commissioner (or the ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both case law and the regulations require an ALJ to minimally articulate the specific reasons for the

16

credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determinations was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Mr. Zimny challenges the ALJ's findings at Steps 3 and 5 of the sequential analysis. He makes these challenges on several grounds. *First*, Mr. Zimny claims that at Step 3, the ALJ improperly determined that his impairments do not meet or equal one of the Listed Impairments. *Second*, Mr. Zimny claims that at Step 5, the ALJ improperly determined that a number of jobs in the national economy exist that Mr. Zimny could perform. Mr. Zimny argues that the evidence requires an outright reversal of the ALJ's decision or, at the very least, a remand for further proceedings (Pl.'s Mem. at 20). We address these challenges in turn.

## IV.

A Step 3 finding requires the ALJ to determine whether a claimant's limitations (which were found severe at Step 2) meet or equal a listed disability found within 20 C.F.R. Part 404, Appendix 1, Subpt. P. At this step, the burden of proof rests with the claimant, who must show that his impairments meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity. *See Young*, 957 F.2d at 389.

Mr. Zimny asserts that his impairments meet or equal the requirements of Listings 12.02 or 12.04, and that the ALJ inadequately explained his Step 3 finding. Mr. Zimny also claims that the ALJ made improper credibility determinations that contributed to the challenged Step 3 finding.

## A.

Mr. Zimny challenges the ALJ's failure to find that his impairments met or equaled Listings

12.02 (organic mental disorders) and 12.04 (anxiety related disorders). Listing 12.02 states in

relevant part as follows:

> 12.02. *Organic Mental Disorder*: Psychological or behavioral abnormalities
> associated with a dysfunction of the brain. History and physical examination or
> laboratory tests demonstrate the presence of a specific organic factor judged to be
> etiologically related to the abnormal mental state and loss of previously acquired
> functional abilities.

Listing 12.04 states in relevant as follows:

> 12.04. *Affective Disorders*: Characterized by a disturbance of mood,
> accompanied by a full or partial manic or depressive syndrome. Mood refers to a
> prolonged emotion that colors the whole psychic life; it generally involves either
> depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are

satisfied, or when the requirements in C are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.02,

12.04.

To satisfy the requirements of Listings 12.02(B) and 12.04(B), both require a showing that

the impairment resulted in at least two of the following:

1. Marked restriction in activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02(B)(1)-(4); § 12.04(B)(1)-(4).

The parties do not address the requirements of the "A" criteria of Listings 12.02 and 12.04,[4] and it appears that there is no dispute that Mr. Zimny's conditions satisfy those criteria.[5] Mr. Zimny asserts that the evidence shows that he also meets the criteria of B(2) and (3), on the ground that his medical record shows that he has marked difficulties in maintaining social functioning and has marked difficulties in maintaining concentration, persistence or pace (Pl. Reply Mem. 6-7). We conclude that the record does not substantiate that Mr. Zimny has difficulties in either of these areas.

Mr. Zimny argues that Dr. Gilliland's 1993 report indicates that he has marked difficulties with concentration, persistence and pace and in social functioning (Pl. Reply Mem. 6-7). Dr. Gilliland's report indicates that Mr. Zimny had average intellectual functioning and that his verbal functioning was average, while his numeric reasoning indicated only "mild difficulty" (R. 17). Furthermore, while the Report indicated some cognitive slowing, the testing revealed "adequate memory abilities" (R. 17).

Nowhere in his report does Dr. Gilliland state that Mr. Zimny had marked difficulty in either social functioning or in concentration, persistence and pace. To the contrary, Dr. Gilliland noted that Mr. Zimny was "alert, well oriented, pleasant and cooperative" (R. 151); that his "speech was fluent" and that he was "attentive throughout all testing sessions" (R. 151); and that while testing suggested

---

[4]In his decision, the ALJ notes that Mr. Zimny failed to meet the requirements of listings 12.02 and 11.04 (R. 17). Because the parties discuss listings 12.02 and 12.04 in their briefs and fail to question the ALJ's notation of Listing 11.04, we conclude – as did the parties – that the reference to Listing 11.04 was a typographical error and that the ALJ was discussing Listing 12.04.

[5] It appears undisputed between the parties that Mr. Zimny meets criteria "A" of Listings 12.02 and 12.04. Furthermore, in his report, for Listing 12.02 (Organic Mental Disorders), Dr. Travis marked that Mr. Zimny had psychological or behavioral abnormalities associated with a dysfunction of the brain and that he had a medically determinable impairment present that does not precisely satisfy the diagnostic criteria above (R. 192). For Listing 12.04 (Affective Disorders), Dr. Travis marked that Mr. Zimny had a medically determinable impairment that does not precisely satisfy the diagnostic criteria for atypical depression (R. 194).

that Mr. Zimny might have difficulty in managing anger, in fact he appeared to be "coping relatively well with the multiple pressures that are confronting him" – which, in 1993, included a divorce proceeding (R. 156).

In addition, even assuming that Dr. Gilliland's report could be construed as evidence of marked difficulties, the ALJ did not err in discounting that report in light of far more recent medical assessments. In July 2001, Dr. Vora conducted a psychiatric examination of Mr. Zimny. Dr. Vora concluded that while Mr. Zimny suffered from atypical depression and had some problems with memory, Mr. Zimny was alert, displayed normally productive speech, and demonstrated no looseness of association, flight of ideas, thought blocking or tangentiality (R. 163-164). Dr. Vora also found Mr. Zimny to be "sociable" and "cooperative" (R. 164). Dr. Vora's report does not support a conclusion of marked difficulties either in social functioning or in concentration, persistence or pace. This assessment is consistent with the conclusions reached by Dr. Travis, a state agency psychiatrist, in August 2001. After reviewing Mr. Zimny's medical record, Dr. Travis determined that Mr. Zimny did not meet the "B" criteria of Listings 12.02 or 12.04, particularly noting that Mr. Zimny only exhibited mild difficulties in maintaining concentration, persistence or pace, and had no difficulties in social functioning (R. 201).

We also note that there is non-medical evidence that further supports the ALJ's conclusion. While Mr. Zimny testified that he has problems with memory and in concentrating, thinking and completing tasks he has started (R. 125), Mr. Zimny is able to compensate for his mild to moderate limitations in executive functioning by maintaining a daily planner (R. 41). We further note that Mr. Zimny engaged in full-time work for a number of years after Dr. Gilliland's 1993 report; lost his full-time employment in April 2001 as part of an economically-motivated layoff (and not due to

20

performance inadequacies or problems in social interaction); and has worked part-time since October 2001, without any evidence of performance inadequacies or problems in social interactions.

Thus, based on these doctors' opinions and other evidence from the hearing, substantial evidence supports the ALJ's conclusions that while Mr. Zimny experiences mild difficulties, his impairments are not severe enough to meet the criteria for Listings 12.02 and 12.04.

### B.

Mr. Zimny also asserts that the ALJ failed to examine his entire medical history and his conditions collectively when the ALJ found that his medically determinable impairments did not meet or medically equal one of the impairments in the Listings (Pl.'s Mem. at 16, 17). Specifically, he argues that the ALJ failed to consider whether the combination of his impairments, which include organic brain disorder, lower back pain with herniated discs, and atypical depression, are of the severity required by the Listings (Pl. Mem. 17). We do not find this argument persuasive.

The ALJ's decision shows that he considered the history and treatment of Mr. Zimny's low back pain with herniated discs and atypical depression (R. 16). The ALJ examined the report of Mr. Zimny's treating physician, Dr. Payne, who treated of Mr. Zimny for low back pain following a laminectomy, and he followed Mr. Zimny's progress after the surgery (R. 16). The ALJ also noted Dr. Karri's diagnosis of low back pain, disc herniation, and a history of closed head injury (R. 16). The ALJ discussed Dr. Vora's diagnosis of atypical depression and organic brain damage secondary to head trauma (R. 16). The ALJ also discussed the opinions and conclusions of state agency non-examining consultants, Dr. Travis and Dr. Gatanco, who analyzed Mr. Zimny's medical file (R. 16, 18). The ALJ considered Dr. Travis' conclusion that Mr. Zimny suffered from non-severe organic brain disorder with only mild limitations in concentration, persistence and pace (R. 16, 18). The ALJ

also considered Dr. Gatanco's conclusion that Mr. Zimny has low back pain and a history of closed head injury (R. 16, 18).

After examining Mr. Zimny's medical history, the ALJ concluded that the medical evidence indicates that Mr. Zimny has a "combination of impairments due to traumatic brain injury, status post lumbar spine laminectomy with recurrent herniated nucleus pulpous in lumbosacral spine" which are severe under the Regulations (R. 16-17). The ALJ further held that Mr. Zimny suffered from non-severe atypical depression (R. 16-17). In so concluding, the ALJ noted that Mr. Zimny testified during the hearing about his depression, but he is not seeing any counselors at this time and is not on any prescribed depression medications (R. 17). The ALJ thus concluded that the combination of these impairments is not severe enough to meet or medically equal one of the Listed impairments (R. 17). *See Nelson v. Bowen*, 855 F.2d 503, 508 (7th Cir. 1988) ("The ALJ explicitly stated that '[t]he evidence does not show any medically determinable impairments which, singly or in combination, preclude claimant from engaging in substantial gainful activity.' Thus, the ALJ apparently did consider the combined effects of Nelson's impairments").

An ALJ is not required to exhaustively discuss every piece of evidence in the record, so long as he provides "some glimpse into [his] decision to deny benefits." *Zurawski*, 245 F.3d at 889. Here, the ALJ discussed all of Mr. Zimny's impairments, and he stated that Mr. Zimny has a combination of impairments (R. 16-18). The ALJ's opinion provides the information necessary to discern how he concluded that Mr. Zimny's non-severe atypical depression and low back pain did not combine with his other impairments to render him disabled. The Court finds that the evidence discussed above is substantial enough to support the ALJ's conclusion that the combination of Mr. Zimny's impairments are not severe enough to meet Listings 12.02 and 12.04.

## C.

Next, Mr. Zimny asserts that at Step 3 the ALJ inadequately articulated his reasons for finding that Mr. Zimny's subjective complaints were not entirely credible and that his determination is not substantiated by evidence in the record (Pl. Mem. 14). Mr. Zimny argues that, because the ALJ considered improper factors when making his credibility determination, the ALJ's decision fails to comport with the requirements of SSR 96-7p (Pl. Mem. 14, 15).[6]

We begin by outlining what the ALJ found to be credible, and what the ALJ found not to be credible. In his decision, the ALJ concluded that he found Mr. Zimny's testimony credible (R. 18). In his opinion, the ALJ noted Mr. Zimny's testimony that he has low back pain that "comes and goes" (R. 17). The ALJ also noted that cold weather, standing bent over, slouching while seated and lifting anything over 30 pounds increases his lower pain (R. 17). The ALJ considered that as a result of his traumatic head injury, Mr. Zimny could no longer function in his prior jobs as a computer technician or as a stockbroker (R. 17). Finally, the ALJ noted Mr. Zimny's problems with long-term memory and immediate recall and that Mr. Zimny suffered from some cognitive slowing (R. 17). After considering Mr. Zimny's testimony, the medical record as a whole, and the opinions of state agency non-examining consultants, the ALJ found Mr. Zimny's testimony to be credible (R. 18). The ALJ concluded that Mr. Zimny's testimony and the medical record showed that his "traumatic brain injury has resulted in limitations which are severe within the meaning of the Act . . . ." (R. 18).

---

[6]Under SSR 96-7p, the ALJ must consider in addition to the objective medical evidence the following facts when assessing the credibility of an individual's statements: 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

23

The ALJ, however, determined in the findings portion of his decision that he found Mr. Zimny's allegations regarding his limitations "not totally credible" (R. 20). When making this determination, the ALJ considered Mr. Zimny's testimony regarding the range of activities he performed in his daily living (R. 17). At the hearing, Mr. Zimny testified that he was able to do all chores in his townhouse, which included laundry and grocery shopping (R. 35). He testified that he manages his own money, pays his own bills, and uses a daily planner to keep track of bill due dates (R. 35-36, 41). Mr. Zimny further testified that he is not seeing a counselor or any doctors on a regular basis and is not on any prescribed depression medication (R. 37-38).

When the ALJ discussed Mr. Zimny's credibility, he did not specifically address Mr. Zimny's manipulative limitations or slowed cognitive functioning nor did the ALJ address each of the listed factors in SSR 96-7p (R. 18, 20). The ALJ's opinion, however, does discuss Mr. Zimny's allegations regarding his manipulative limitations and slowed cognitive abilities, which, according to his claims, are factors that contribute to his impairments (R. 17-18). In his discussion of Mr. Zimny's medical history, the ALJ noted the objective medical evidence he relied on when making his credibility determination, particularly his determination regarding Mr. Zimny's manipulative limitations and mental abilities (R. 16-17).

The ALJ made general findings regarding the functional limitations created by Mr. Zimny's mental and physical impairments (R. 18, 20). The ALJ concluded that Mr. Zimny suffers from non-severe atypical depression (R. 17). He is also "status post one back surgery and experiences with recurrent herniated nucleus pulpous with mild restrictions in concentration, persistence and pace, activities of daily living and social functioning with no episodes of decompensation of extended duration" (R. 18). These broad functional areas have been identified by the SSA as contributing to

24

the severity of a claimant's mental impairments. *See* 20 C.F.R. §§ 404.1520. This finding encompasses all of Mr. Zimny's alleged mental impairments and his problems with social functioning.

When making his decision, the ALJ noted that he "carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments" (R. 20). The ALJ acknowledged that Mr. Zimny suffered from some cognitive slowing, but also noted that the same Report showed that Mr. Zimny retained "adequate memory abilities" (R. 17). The ALJ further pointed to Mr. Zimny's mild to moderate limitations in executive functioning and Mr. Zimny's moderate to severe impairments in finger tapping and grip strength, but he remarked that Mr. Zimny's activities of daily living and his ability to live totally independently, and perform all the necessary tasks to do so, revealed that Mr. Zimny's allegations regarding his limitations were not credible, to the extent that Mr. Zimny alleged (R. 18). Furthermore, the ALJ noted Dr. Vora's finding that Mr. Zimny suffered from atypical depression, and his treating doctor noted that his low back pain was resolving (R. 16).

While the ALJ's credibility finding was not accompanied by an extensive discussion of the specific medical evidence contradicting his claims nor an extensive discussion of the factors in SSR 96-7p, the body of the ALJ's opinion does refer to such evidence and the evidence in the record supports the ALJ's credibility determination (R. 16). From these findings, we can "glimpse" the ALJ's reasoning with regard to the evidence of slowed cognitive functioning and manipulative limitations and how that evidence factored into his opinion of Mr. Zimny's credibility regarding his limitations. *See Zurawski*, 245 F.3d at 889. Thus, it is reasonable to conclude that the ALJ

"minimally articulated" the reasons for his credibility finding and that substantial evidence in the record supports the ALJ's credibility finding. *Zurawski*, 245 F.3d at 887.[7]

## V.

Moving on to Step 5, Mr. Zimny claims that the ALJ's made an erroneous Step 5 decision when he determined that Mr. Zimny could perform a significant number of light work jobs that exist in the national economy (Pl. Mem. 18). Mr. Zimny also argues that the ALJ failed to adequately build a bridge between the medical evidence and his RFC finding (*Id.* at 13-14), and that the VE's testimony about what constitutes "light work" conflicts with applicable law (R. 18-20). We do not find these arguments persuasive.

### A.

Mr. Zimny argues that the hypothetical question the ALJ posed to the VE failed to include all his limitations that the medical records support (Pl. Reply Mem. 8-11). A hypothetical question posed to a VE should be supported by medical evidence in the record. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). We find that the ALJ's hypothetical question adequately reflected Mr. Zimny's impairments to the extent that they were supported by medical evidence in the record. In posing the hypothetical to the VE, the ALJ requested that Mr. Zimny's age, work experience, and physical limitations (including a limitation to light, unskilled work) be considered in determining whether Mr. Zimny could perform his past relevant work and the number of jobs available in the local economy (R. 47).

---

[7]Mr. Zimny argues that the ALJ placed undue weight on his ability to perform daily activities and his absence of medication (Pl.'s Mem. 14-16). We disagree. The ALJ certainly considered those factors, as the ALJ is required to do under SSR 96-7p (*see* page 23 n. 6, *supra*). For the reasons stated above, we disagree that the ALJ's conclusion was based solely on those factors.

Mr. Zimny claims that the ALJ should have considered the VE's testimony in response to his hypothetical, which added the following limitations to the hypothetical posed by the ALJ:

> Individual having difficulties maintaining concentration, persistence and pace. Also, having a low frustration tolerance. Difficulty taking criticism from supervisors or instructions from supervisors. Restricted from any find motor skills on a repetitive basis but able to do them on an occasional basis . . . . no frequent bending or stooping.

(R. 47-48). There are two problems with Mr. Zimny's argument.

*First*, there is insufficient evidentiary support for most of these limitations. With regard to difficulties maintaining concentration, persistence or pace, for the reasons stated above, the ALJ's finding that Mr. Zimny does not have marked difficulties in these areas is supported by substantial evidence. Limitations in maintaining concentration, persistence or pace that are only "mild" are generally considered to have a minimal effect on a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1520(a). Furthermore, Mr. Zimny's hypothetical limitations based on frustration, and difficulties in handling criticism and instructions from supervisors, are not supported by substantial evidence. Indeed, Dr. Gilliland noted that Mr. Zimny appeared to cope well with his anger (R. 156). And, there is no evidence from Mr. Zimny's full-time work history – or his part-time work history offering his alleged disability onset date – to substantiate this claim. While Mr. Zimny alleges he has a low frustration tolerance and gets upset when people criticize him, none of the doctors who examined Mr. Zimny or his medical history opined that Mr. Zimny had limitations in this area.

*Second*, there was medical evidence that could support Mr. Zimny's assertions that he has limitations on fine motor skills. But, in response to that portion of the hypothetical posed by Mr. Zimny's counsel, the VE said that only the assembler jobs (totaling 23,000) would be excluded. All

27

the other jobs – 18,400 – still could be performed with that limitation (R. 49); and, 18,400 jobs still constitutes a significant number of jobs that precludes a finding of disability. *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1,400 job positions equals a significant number of jobs).

Accordingly, we find no error in the ALJ's treatment of Mr. Zimny's hypothetical to the VE, or the VE's response.[8]

## B.

Mr. Zimny's second argument at Step 5 relates to the "logical bridge" requirement for all ALJ opinions. *See generally, Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001). This Court is required to test whether an analysis at least "minimally" discusses and considers the evidence on the issue of disability, including evidence that would contradict the Commissioner's final conclusion. *Zurawski*, 245 F.3d at 888; *Clifford*, 227 F.3d at 870; *Green v. Shalala*, 204 F.3d 780, 781 (7th Cir. 2000). As many cases now hold, the ALJ's analysis must build an "accurate and logical bridge from the evidence to the conclusion." *Clifford*, 227 F.3d at 872.

The ALJ concluded that Mr. Zimny was limited to the performance of light unskilled work (R. 18). Mr. Zimny asserts that the ALJ inappropriately relied on the opinion of a non-examining state agency physician. This conclusion, however, misreads the ALJ's opinion. In determining Mr. Zimny's RFC, the ALJ considered Mr. Zimny's testimony and "the medical records as a whole, as

[8]Mr. Zimny criticizes the ALJ's use of the Medical-Vocational Guideline 202.21 ("the Grids") in his Step 5 analysis (Pl.'s Mem. at 13). SSR 85-15 states that where a claimant suffers both exertional and non-exertional impairments, the Guidelines may provide a framework for consideration. *See also Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). Because the ALJ determined that Mr. Zimny suffered from exertional and non-exertional limitations, the ALJ applied the Grids as a framework and also obtained vocational expert testimony; contrary to Mr. Zimny's argument, the ALJ did not rely solely on the Grid. The ALJ adopted the VE's testimony that jobs in the national economy were available (R. 19). After applying the VE's testimony, the evidence in the record, and the Grids as a framework, the ALJ concluded that Mr. Zimny was not disabled because he could make a successful adjustment to work that exists in significant numbers in the national economy (R. 19). The Court finds that the ALJ properly applied the Grids as a framework and that substantial evidence supports the ALJ's conclusion that Mr. Zimny could perform other jobs in the national economy.

28

well as, the opinions of state agency non-examining consultants" (R. 18). The ALJ considered the opinions of these consultants but did not exclusively rely on their opinions when making his conclusion. Specifically, the ALJ referred to a report by Dr. Gatanco, a state agency internist, which concluded that Mr. Zimny could perform medium work despite his impairment (R. 18). The ALJ disagreed, concluding that Dr. Gatanco's assessment was not "entirely consistent" with the objective evidence of record (R. 18). Rather, the ALJ relied on the other medical evidence, as stated above, to draw his conclusion about Mr. Zimny's RFC. Thus, it was reasonable to conclude based on the medical evidence and the VE's testimony that Mr. Zimny was limited to light work (R. 18). While the ALJ does not explicitly specify which pieces of medical evidence he relied on when determining Mr. Zimny's RFC, the ALJ's opinion provides sufficient information to discern how the ALJ came to his conclusions.

## C.

Mr. Zimny's third argument at Step 5 relates to the VE's testimony and its relationship to the *Dictionary of Occupational Titles*. Mr. Zimny asserts that because the VE's testimony conflicts with the *Dictionary of Occupational Titles* classifications, the ALJ incorrectly relied on the VE's testimony (Pl. Reply Mem. 13). Mr. Zimny contends that the VE's job listings conflicted with the *Dictionary's* classifications of skill and exertional levels (*Id.*, at 15). Mr. Zimny further argues that the SSR 00-4P imposes a duty on the ALJ to ask the VE at the hearing whether her testimony is consistent with the *Dictionary* and that the ALJ's failure to do so constituted legal error (*Id.*, at 14, 15). Lastly, Mr. Zimny argues that the ALJ committed legal error when he failed to give a reasonable explanation for using the VE's testimony to support his decision where the testimony conflicted with the *Dictionary* (*Id.*, at 14, 15). The Court rejects Mr. Zimny's arguments.

The *Dictionary* identifies a specific vocational preparation ("SVP") time for each described occupation. An SVP is the amount of time necessary to learn to perform the job. The *Dictionary* assigns unskilled work SVPs of one or two, which means that a person can learn to do these jobs in less than thirty days. The *Dictionary* assigns SVPs of three and four to lower level semi-skilled work, which can be learned in thirty days to six months. The *Dictionary* assigns SVPs of five or six to upper-level semi-skilled which, which requires up to two years to learn, and SVPs of seven to nine, which require more than two years to learn.

Mr. Zimny asserts that the jobs that the VE identified (*i.e.* inventory clerk, order clerk, information clerk, assembler, and product inspector) conflict with the *Dictionary's* classifications for unskilled work (Pl. Reply Mem. 13). The *Dictionary* assigns all these positions an SVP of 4-5 rather than an SVP of 1-2 which corresponds to unskilled work.[9]

The Seventh Circuit's decision in *Donahue v. Barnhart*, 279 F.3d 441, (7th Cir. 2002), squarely forecloses Mr. Zimny's arguments. In that decision, the Seventh Circuit addressed the issue of what happens when a VE's testimony differs from the *Dictionary* and what conclusions the ALJ may draw when he fails to address the inconsistencies. In *Donahue*, the Seventh Circuit found that "[w]hen no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the *Dictionary's* – for the *Dictionary*, after all, just records other unexplained conclusions and is not even subject to cross-examination " *Donahue*, 279 F.3d at 446. The Seventh Circuit acknowledged that if the basis of the VE's conclusions is questioned at the hearing, then the ALJ should make an inquiry to learn

---

[9]Inventory clerk has an SPV of 4 (222.387-026); order clerk has an SPV of 4 (249.362-026); information clerk has an SPV of 4 (237.367-022); inspector has an SPV of 6 (619.381-010). Mr. Zimny also argues that a position of inventory clerk includes medium strength work which conflicts with the definition of light work (Pl. Reply Mem. 14).

whether the expert's conclusions are reliable. *Id.* Social Security Ruling 00-4p requires the ALJ "to explain [in the] determination or decision how any conflict [with the *Dictionary*] that *has been* identified was resolved." *Id.* (emphasis added). The Seventh Circuit determined that the Social Security rules require an explanation only if the claimant or the ALJ noticed the conflict and asked for an explanation. *Id.* at 446-47. Thus, essentially, the claimant or ALJ must identify the discrepancy. According to the Seventh Circuit, raising a discrepancy after the hearing is too late, because "[a]n ALJ is not obliged to reopen the record." *Id.* at 447.

After reviewing Mr. Zimny's file and hearing Mr. Zimny's testimony, the ALJ presented a statement of Mr. Zimny's abilities and limitations. In response, the VE subsequently produced several job titles and numbers. At this point, Mr. Zimny, who was represented by counsel, could have cross-examined the VE regarding the discrepancies between his testimony and the *Dictionary* classifications and why the expert's conclusions did not match the *Dictionary*. Yet counsel did not ask the VE about the reason for this discrepancy. Therefore, based on the record the ALJ had in this case and the failure of Mr. Zimny's counsel to point to any shortcomings in the VE's testimony during the hearing, the ALJ was entitled to reach the conclusions that he did.[10]

---

[10]Mr. Zimny also argues that the ALJ issued a contradictory ruling when he determined that the ALJ could not perform a full range light work; but, in his RFC finding, he concluded that Mr. Zimny could perform a significant range of light work (Pl. Mem. 14). However, The ALJ's finding that Mr. Zimny could perform a "significant" range of light work did not equate with a finding that he could perform a full range of light work. The ALJ found that Mr. Zimny's exertional and non-exertional limitations did not allow him to perform the "full" range of light work; but, he also determined that Mr. Zimny retains the capacity to perform a significant range of light, unskilled work on a sustained basis (R. 17, 20). Substantial evidence exists which supports the ALJ's findings.

## CONCLUSION

We have little doubt – as did the ALJ – that Mr. Zimny is afflicted with impairments and other circumstances that create an unfortunate life situation. Not every set of impairments, however, meets the statutory definition of disability, and to Mr. Zimny's misfortune, the ALJ's conclusion that Mr. Zimny's condition did not meet that statutory definition was supported by substantial evidence and thus must be affirmed. For the foregoing reasons, Mr. Zimny's motion for summary judgment (doc. #16) is denied, and the Commissioner's motion for summary judgment (doc. #19) is granted.

The Clerk of the Court is directed to enter final judgment for the Commissioner and to terminate this case.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: October 26, 2005